UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:22-cr-00594-RLW-NCC |
| LAVEAL DAVID JONES, | ) ) ) |
| Defendant. | ) ) |

**<u>DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE</u>**

**I.   Laveal's incarceration at a young age significantly impaired his development and ability to thrive in society once released**

"These walls are funny. First you hate 'em, then you get used to 'em. Nuff time passes, you get so you depend on 'em. That's *institutionalized*."  Morgan Freeman famously discussed what it means to be institutionalized in his portrayal as Red in the Shawshank Redemption.  Unfortunately, to be institutionalized effects numerous individuals who are incarcerated for lengthy periods of time, Laveal Jones being one of them.

Institutionalization refers to deficits or disabilities in social and life skills which develop after a person has spent a long period living in prisons or other remote institutions. Individuals in institutions are often deprived, whether unintentionally or not, of independence and of responsibility, to the point that once they return to "outside life" they are often unable to manage many of its demands.  An inmate who is institutionalized will most likely struggle with day-to-day activities and interactions once released from prison.

1

Additionally, research has consistently shown that in particular, incarceration at a young age has a profoundly negative impact on future psychological and mental maturation.[1] One of the reasons that juvenile incarceration has such a significant impact on future brain development is due to the extreme changes that occur in the brain during adolescence.  The brain changes characteristic of adolescence are among the most dramatic and important to occur during the human lifespan.  The courts and scientific research agree that brain development continues into an individual's mid-twenties.  Recent developments in adolescent brain imaging have shown that "the brain is still maturing well into the mid-20s, especially in regions responsible for regulating emotions, controlling impulses, and balancing risk and reward." *United States v. C.R.*, No. 09-155, 2011 WL 1901645, at 155 (E.D.N.Y. 2011).  The portion of the brain that is responsible for executive functions such as planning, judgment, future orientation, and impulse control—the frontal lobe—is the last to develop.[2] This state of development is reflected in the level of culpability assigned to young offenders. See *Roper v. Simmons*, 125 S.Ct. 1183, 1195 (2005) (relying on studies indicating that adolescents are less culpable for their actions than adults because of an underdeveloped sense of responsibility in youth); *Gall v. United States*, 552 U.S. 28 (2007) (relying on the youth a 21-year-old to justify a below-guidelines sentence).

Due to the numerous developmental changes in the adolescent brain, youth incarceration has been shown to have a lasting, adverse impact on the developing adolescent.  Adolescence is marked by increases in psychosocial maturity that are reflected in improvements in the ability to curb impulsive and aggressive behavior, the ability to see things from multiple temporal and social vantage points, and increased independent functioning.[3]  Because this is such a vital time for brain development, when these skills are not practiced and may even be actively discouraged in jails, detention centers, or Division of Youth Services facilities, adolescents have limited ability to attain these psychosocial capacities.[4]

Youth incarceration has other negative life-long consequences that impact brain development as well. Incarceration separates youth from their parents at a time in development when youths' well-being

---

[1] Dmitrieva, Julia; Monahan, Kathryn C; Cauffman, Elizabeth; Steinberg, Laurence, Arrested development: The effects of incarceration on the development of psychosocial maturity, Development and Psychopathology; Cambridge Vol. 24, Iss. 3, (Aug 2012)

[2] Allison Burke, Under Construction:  Brain Formation, Culpability, and the Criminal Justice System, 34 Int'l J.L. Law and Psychiatry 383 (2011).
[3] Steinberg, L., & Cauffman, E. (1996). Maturity of judgment in adolescence: Psychosocial factors in adolescent decision making. Law and Human Behavior, 20, 249–272.
[4] *Id.*

2

and acquisition of coping skills are still influenced heavily by the family.[5]  Additionally, at a time when friends and peers arguably have the most influence over one's life, incarcerated adolescents are placed in an environment where their only peer group is composed of other antisocial youth, which limits their opportunities to practice responsible judgment and can have a lifelong impact.[6]  Furthermore, the skills that adolescents acquire in incarceration serve to help them survive behind bars, and are not focused on learning skills to help them survive in the outside world.  In fact, strategies that are successful for psychosocial maturity and social functioning beyond bars may be maladaptive for life on the inside. For example, incarcerated individuals undergo repetitive and restrictive routines that are regulated by extensive and rigid rules, and they may lose the ability to cope with the demands of an outside world that lacks rigid structure.

      Laveal became involved with the criminal justice system at an early age.  Laveal was arrested for the first time at age 13.  By the time he was 14, he was committed to a residential facility in the Division of Youth Services for an adjudication of property damage in the 1st degree from St. Louis City.  He was again committed to DYS at the age of 15 on March 6, 2014, for an adjudication for Robbery 2nd in St. Louis County.  When Laveal found himself in the juvenile criminal justice system, his mother told the court that she thought his best option was to be placed in the Division of Youth Services as opposed to with her.  While incarcerated in DYS, Laveal had little contact with his family during this very crucial time in his development.

      In their sentencing memo, the Government cites to the 2006 case *United States v. Plaza*, arguing that granting a downward variance due to age would constitute reversible error.  Courts and the United States Sentencing Commission have found in the last 20 years that in fact, age, especially the young age of a defendant, is in fact very relevant to sentencing considerations.  In the *Plaza* case, the court stated that age was just one of several factors that the court considered in granting a downward variance.  Great strides have also been made in the study of adolescent brain development since 2006- so much so that the Sentencing Commission has proposed in their 2024 amendments to the guidelines that a downward departure be considered for a defendant's youthfulness not only at the time of the instant offense, but prior offenses as well. Their amendment cites to the fact that the development of the brain into one's mid-20's contributes greatly to one's risk seeking and impulsive nature. The amendment also states that

---

[5] Helsen, M., Vollebergh, W., & Meeus, W. (2000). Social support from parents and friends and emotional problems in adolescence. Journal of Youth and Adolescence, 29, 319–335.
[6] *Id.*

3

"the age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age…accordingly, in an appropriate case, the court may consider whether a form other than imprisonment might be sufficient to meet the purposes of sentencing."

Laveal was arrested for Robbery 2nd when he was 18 years old and was sentenced to 10 years in the Missouri Department of Corrections. He never finished high school as a result of his incarceration. Missouri Department of Corrections records indicate that Laveal struggled with his emotions while in custody and even expressed a concern that he didn't want to have "the same attitude on the streets." His mother, by her own admission, never visited him when he was in the Department of Corrections and would only speak with him on the phone.

Laveal was only out of custody from Missouri Department of Corrections for a few months before being arrested on the instant offense. He was released on parole from MDOC on July 20, 2022, after spending the last 5 years in custody. He never got the chance to experience being a part of the working world, only having very brief periods of employment at McDonald's or with family. He also never got the chance to address his substance use or mental health issues in a non-secure setting. His family says that to this day they believe that Laveal suffers from anxiety and depression, but all his care since the age of 18 has been provided in jails and prisons. Exposure to positive family relationships, prosocial peers, and nurturing school and extracurricular contexts are each linked to greater psychosocial maturity during the adolescent years.[7] Laveal was isolated from all these opportunities by his early incarceration.

Furthermore, research has shown that incarcerated adolescents are more likely than not to reoffend.[8] In a 2001 study, it was estimated that 75% of adolescents would reoffend.[9] This statistic correlates with many other studies that have found the lasting effects of juvenile incarceration to be damaging. The fact that incarceration impairs positive psychosocial development and makes the transition into adulthood difficult, resulting in an impaired ability to reintegrate successfully into the community, accounts for at least some of the high prevalence of recidivism. There seems to be a strong connection between the difficulties juvenile delinquents often face after incarceration and their reversion back to criminal behaviors. Laveal unfortunately fell into this cycle after his release on parole in 2022.

---

[7] Dmitrieva, Julia; Monahan, Kathryn C; Cauffman, Elizabeth; Steinberg, Laurence, Arrested development: The effects of incarceration on the development of psychosocial maturity, Development and Psychopathology; Cambridge Vol. 24, Iss. 3, (Aug 2012)
[8] *Id.*
[9] *Id.*

4

According to Laveal's girlfriend, Shaneel Johnson, when Laveal was released on parole, he expressed that he had some frustrations with how different the world was, and the pace of things brought him more anguish.  He also had difficulty finding a job.  Unable and ill-equipped to adapt to life beyond bars, he quickly ended back in the criminal justice system.

## II. Laveal felt abandoned by his family with his mother preoccupied and his father incarcerated during his childhood

Both Laveal's mother and father would say that they lacked presence in Laveal's life growing up. Laveal has 14 siblings, nine of whom are older than him.  Laveal's oldest sister was born to his father Laveal Sr. when Laveal Sr. was only 13 years old.  His father was only 23 years old when Laveal was born.  Laveal's father was incarcerated when Laveal was very young, being sentenced to 10 months in BOP on October 11, 2001, and 10 years MDC on November 30, 2001, when Laveal was only 2 years old.  Laveal Sr. was again sentenced to BOP, this time for 70 months, in 2008.  Laveal never had regular contact with his father as a kid.  Being the middle sibling out of 14, his dad prioritized contact with his daughters while he was incarcerated, but not Laveal.  Laveal's mother didn't have the time or resources to take Laveal to visit his father in BOP and given that she was more concerned about Laveal's younger siblings and was no longer romantically involved with Laveal's dad, she did not facilitate Laveal having any kind of relationship with his father.  Although Laveal did live with his father briefly when he was a teenager, Laveal had already had numerous contacts with the juvenile criminal justice system by then.



*Laveal with his father*

5

Laveal's well-being was not a priority for his mother either. According to Laveal's mother, Laveal "probably felt that she didn't want him around." Laveal's mother separated from Laveal's dad when he was 2 years old. The man she married after separating from Laveal's father was robbed and killed in 2005. Her next husband did not want Laveal living with them. Laveal's mother struggled financially, moving in with her parents at times when her utilities were turned off. Laveal bounced around from living with aunts, uncles, and grandparents, never having a stable place to call home. Laveal fell into a great depression when both of his grandparents passed away in 2014, the same year that he witnessed his best friend's murder. Laveal and his mother both agree that he had very little supervision growing up. This is evidenced by his accounts of being sexually abused by one of his aunts for several years, but not confiding in any family about this. He was "in the streets" from a young age and was shot in the foot at the age of 17.

When Laveal was in the juvenile system, his mother told his deputy juvenile officer that she didn't bother to give Laveal consequences for his actions. Laveal was referred to counseling several times throughout his childhood, but his mother "didn't see the point" so never took him to any follow up appointments. Laveal says she gave up on him and makes him feel that she does not love or care for him. Laveal reported he did not have a good childhood and felt like he was looking for love and attention which caused him to follow peers that were not good influences. Laveal fell through the cracks in his family, with his parents having other priorities and issues of their own.



*Laveal (in blue) pictured with 7 of his 14 siblings*

6

### III. The federal offense conduct merits consideration for a downward variance

Although Laveal pled guilty to charges of carjacking resulting in death and discharge of firearm causing death in furtherance of a crime of violence, as well as an unrelated charge of felon in possession of a firearm, the circumstances of the underlying offense deserve some context.  The government states in their sentencing memo that Laveal laid "lying-in-wait for the opportunity to rob" D.J., but nothing in evidence or in the facts section of the plea agreement support this theory.  Rather, the facts demonstrate a physical confrontation that turned deadly but do not evince an intent to rob.  The facts that Laveal admitted in the plea agreement state that at some time while Laveal and D.J. were in D.J.'s Kia late in the evening, Laveal confronted D.J. about money that Laveal believed D.J. owed him.  That confrontation turned into a physical fight.  Laveal then used a firearm belonging to D.J. to fire twice, killing him.  After shooting D.J., Laveal stripped D.J. so that his blood could not be recovered from D.J.'s clothing.  Laveal then drove D.J.'s Kia to East Saint Louis where the car was destroyed by fire.

Furthermore, Laveal told a jailhouse informant that "he got into it with his buddy and shot his friend."  Laveal told this informant that "he wanted to get his money back" from his friend.  Laveal told the informant that he got into a "scuffle" with D.J. after Laveal confronted him about getting his money back that left Laveal with a bloody nose.  Laveal shot D.J. with D.J.'s gun.  Laveal told the informant that he panicked about his blood being found in the car after D.J. died, which is why he stripped D.J of his clothing and took the clothing, along with D.J.'s money, drugs, and car.  The facts in this case demonstrate that Laveal's taking of D.J.'s Kia was an afterthought following his death, not Laveal's initial intent.  The fact that Laveal was in possession of the Kia for only a few hours before the car was destroyed is further evidence of this.  This does not mean that Laveal should not be punished significantly for his offense conduct.  However, 18 U.S. Code § 3553(a) directs the court to consider the nature and circumstances of the offense, and the unique circumstances of the underlying conduct must be considered individually.

The government cites to several plea agreements from the Eastern District of Missouri over the last several years in their sentencing memorandum to support their argument that parity demands a 360-month sentence. The Eighth Circuit, like most circuits, has concluded that the statutory direction to avoid unwarranted sentence disparities refers to "national disparities, not differences among co-conspirators." *United States v. Fry*, 792 F.3d 884, 892 (8th Cir. 2015) (collecting cases). Further, 18 U.S.C. § 3553(a)(6) directs a court to consider the "need to avoid unwarranted sentence disparities among defendants with **similar records** who have been found guilty of **similar conduct**." (emphasis

7

added). There is simply not enough information available about these defendants or these cases for that argument to be persuasive to the Court in any regard.

Despite the government's attempts to compare the facts of this case with those plea agreements cited in their sentencing memorandum, there is insufficient information available about the defendants and those cases to support this argument. For example, defense counsel notes that the *Dozier* case cited also resulted in a second carjacking and shooting of a second victim.[10]

Additionally, the national data in fact supports an argument that a 240-month sentence would not cause an unwarranted sentencing disparity. According to the Judiciary Sentencing Information Data (JSIN) for last 5 fiscal years, there were 41 defendants whose primary guideline was §2A1.1, with a Final Offense Level of 40 and a Criminal History Category of II.[11] For the 41 defendants who received a sentence of imprisonment, the average length of imprisonment imposed was 259 months and the median length of imprisonment imposed was 240 months.[12] Specifically in the Eastern District of Missouri, the mean sentence for Murder in Fiscal Year 2023 was 225 months and the median sentence was 216 months.[13]

### IV.     Conclusion

In addition to the arguments laid out above, Laveal's first and only child was born while he was incarcerated on this offense.  Laiya DaKota Jones will turn one soon.  Laveal's girlfriend and Laiya's mother, Shaneel Johnson, has known Laveal since they were children, and he has her unwavering support.  Laveal lights up when he talks about his baby girl, and the recent video visits and photos he has received of her.  He knows that his actions have caused him to be absent from her life but is working hard to have a relationship with her from behind bars.  His greatest wish is to be able to be there when she graduates from high school.

WHEREFORE Laveal Jones respectfully requests this Court find reasons for a variance and sentence him below the guidelines to 240 months.

---

[10] https://www.justice.gov/usao-edmo/pr/st-louis-man-who-killed-woman-during-two-carjackings-sentenced-40-years-prison
[11] "Judiciary Sentencing Information", United States Sentencing Commission, available at https://jsin.ussc.gov/analytics/saw.dll?Dashboard
[12] *Id.*
[13] "Statistical Information Packet", United States Sentencing Commission, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2023/moe23.pdf

8

        Respectfully submitted,

/s/ *Julie Clark*
Assistant Federal Public Defender
1010 Market Street - Suite 200
St. Louis, Missouri  63101
Telephone: 314 241 1255
Fax: 314 241 3177
E-Mail: Julie_Clark@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2024, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Ryan Finlen, Assistant United States Attorney.

        /s/ Julie Clark